**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---------------------------------------------------------------

BRAD MURASZEWSKI and ROBERTA
MURASZEWSKI,

                Plaintiffs,

     v.

ASCENSION HEALTH, COLUMBIA ST.
MARY'S HOSPITAL MILWAUKEE, INC., and
ASCENSION ST. FRANCIS HOSPITAL, INC.,

          Defendants.

**Civ. No. 2:24-cv-750**

**COMPLAINT**

---------------------------------------------------------------

    Plaintiffs BRAD MURASZEWSKI and ROBERTA MURASZEWSKI, through their undersigned counsel, EISENBERG & BAUM, LLP, state their Complaint against Defendants ASCENSION HEALTH, COLUMBIA ST. MARY'S HOSPITAL MILWAUKEE, INC. ("St. Mary's") and ASCENSION ST. FRANCIS HOSPITAL ("St. Francis"), collectively "Ascension":

## INTRODUCTION

    1.    This case is about access—access to information and health care services. As Deaf individuals, Plaintiffs Brad and Roberta Muraszewski primarily communicate in American Sign Language ("ASL"). They require ASL interpreters to receive equal treatment and equally effective communication in medical settings.

    2.    On March 1, 2021, the Muraszewskis arrived at St. Mary's Hospital Milwaukee, a facility owned and operated by Ascension, to be admitted for Mr. Muraszewski's urgent open-heart surgery, as directed by his doctor. During his stay, St. Mary's repeatedly ejected the Muraszewskis' interpreters from the premises without offering an equally effective alternative, thus removing their access to effective communication during an immensely stressful medical event.

3.      Their troubles continued at another Ascension facility, St. Francis Hospital, where Mr. Muraszewski sought cardiac rehabilitation following his surgery. St. Francis repeatedly failed to provide the interpreters necessary for Mr. Muraszewski to rehabilitate from his surgery, delaying his recovery and forcing him to seek care elsewhere.

4.      Mr. and Mrs. Muraszewski have the right to equal access to services offered by Ascension, St. Mary's, and St. Francis as enjoyed by non-disabled people.

5.      Under federal regulations, which authoritatively construe the associated statutes, a covered entity must provide "appropriate auxiliary aids" to deaf patients "where necessary to ensure effective communication." *See, e.g.*, 28 C.F.R. § 35.160(b)(1), *adopted by* 45 C.F.R. § 92.102(a) (regulation implementing the Affordable Care Act).

6.      Ascension discriminated against Mr. and Mrs. Muraszewski by denying them access to the ASL services they required to understand and participate in Ascension's programs and services.

7.      Ascension's failure to provide Mr. and Mrs. Muraszewski access to ASL interpreters prevented them from enjoying the same services that a hearing person would.

8.      Ascension's discrimination against the Muraszewskis and their resulting lack of understanding caused them to suffer anger, humiliation, frustration, and emotional distress. Civil rights violations are inherently distressing because they inflict profound personal humiliation and reinvoke a history of exclusion.

9.      Mr. and Mrs. Muraszewski seek nominal, compensatory, declaratory, injunctive, and equitable relief; and attorney's fees and costs to redress Defendants' unlawful discrimination against them based on their disabilities in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116.

## PARTIES

10.    Plaintiff Brad Muraszewski is a resident of Wisconsin who is substantially limited in the major life activities of hearing and speaking. Thus, he has a disability within the meaning of state and federal civil rights laws.

11.    Plaintiff Roberta Muraszewski is a resident of Wisconsin who is substantially limited in the major life activities of hearing and speaking. Thus, she has a disability within the meaning of state and federal civil rights laws.

12.    Defendant Ascension Health is a foreign non-stock corporation with a principal office at 4600 Edmundson Road, St. Louis, MO 63134. It has a registered agent for service c/o Corporation Service Company, 33 East Main Street, Suite 610, Madison, WI 53703.

13.    Defendant Columbia St. Mary's Hospital Milwaukee, Inc. is a non-stock corporation engaged in the practice of medicine with a principal place of business at 2323 North Lake Drive, Milwaukee, WI 53211. Defendant has a registered agent for service c/o Corporation Service Company, 33 East Main Street, Suite 610, Madison, WI 53703. At all times relevant to this Complaint, Defendant has been licensed and doing business in the State of Wisconsin.

14.    Defendant Ascension St. Francis Hospital, Inc. is a non-stock corporation engaged in the practice of medicine with a principal place of business at 3237 South 16th Street, Milwaukee, WI 53215. Defendant has a registered agent for service c/o Corporation Service Company, 33 East Main Street, Suite 610, Madison, WI 53703. At all times relevant to this Complaint, Defendant has been licensed and doing business in the State of Wisconsin.

15.    Upon information and belief, Defendants are places of public accommodation and recipients of federal financial assistance.

16.    Medicare and Medicaid reimburse Ascension, St. Mary's, and St. Francis for the

care they provide to Medicare and Medicaid beneficiaries.

17.     Ascension, St. Mary's, and St. Francis agreed to receive federal funds in exchange for promising not to discriminate against qualified individuals with disabilities, among other reasons.

18.     The federal government has substantially performed its obligations under this contractual arrangement with Ascension, St. Mary's, and St. Francis, including reimbursements for Medicare and Medicaid, and was willing and able to perform its remaining obligations.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction for the federal law claim under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for the state-law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal-law claims.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendant resides in this District, and the acts and omissions giving rise to this Complaint occurred in this District.

**STATEMENT OF FACTS**

21.     Brad Muraszewski is a profoundly deaf individual who communicates primarily in American Sign Language.

22.     Roberta Muraszewski is a profoundly deaf individual who communicates primarily in American Sign Language. She has significant difficulty speaking and communicating verbally.

23.     Some background on Deaf culture is necessary to understand the balance of this case. English and ASL are different languages; therefore, the Muraszewskis are unable to communicate effectively by reading lips. Lip reading is the ability to understand another speaker's

speech by watching the speaker's lips. It is no substitute for direct communication through a qualified sign language interpreter because many mouth movements appear identical on the lips. What is more, even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, she or he would still not necessarily understand the English language because English and ASL are distinct languages with different grammatical structures. As another example, ASL and French Sign Language are also distinct languages.

24.     Many factors outside of the Muraszewskis' control reduce the effectiveness of lipreading. Many people, including medical care professionals and other patients, may not speak clearly, have facial hair or accents that interfere with lipreading, cover parts of their mouth when speaking, and/or not look directly at the person who is lipreading. Particularly in medical settings, doctors and other staff tend to use highly technical language that may be unfamiliar to someone whose primary language is not English, making lipreading even more challenging.

25.     Note-writing is similarly ineffective in facilitating effective communication for the Muraszewskis. ASL is a language unique from English, much like Spanish and French are unique languages. Writing a note in English to someone whose primary language is French does not surmount the communication barrier; the note is still written in a language unfamiliar to the other party. The same is true of ASL. Merely writing the message in English does not change the fact that the message is communicated in the reader's non-native and non-primary language. Further, someone communicating by writing a note will necessarily include less detail and context than they would when speaking due to the inherently limited nature of a short, written note. As a result, note-writing — even when paired with lipreading — cannot facilitate effective communication in a medical setting for the Muraszewskis, whose primary language is ASL.

26.     To ensure the Muraszewskis' effective communication, they require a team of two interpreters: one hearing interpreter and one Certified Deaf Interpreter ("CDI"). A CDI is a deaf or hard-of-hearing person who has been certified as an interpreter. The hearing interpreter will translate spoken English into ASL; then the CDI will translate the hearing interpreter's ASL into linguistically and culturally appropriate ASL for Deaf individuals' optimal understanding. This process provides the most optimal, efficient understanding for the Muraszewskis in situations requiring the utmost clarity—such as intense medical events and rehabilitation.

**Events at Columbia St. Mary's Hospital**

27.     On March 1, 2021, the Muraszewskis attended a scheduled appointment with Mr. Muraszewski's cardiologist, Dr. Raggali. During that appointment, Dr. Raggali identified severe symptoms necessitating urgent open-heart surgery.

28.     Mr. Muraszewski originally scheduled surgery for the following week. When scheduling this surgery, Dr. Raggali's office arranged 24/7 access to ASL interpreters with St. Mary's for the duration of Mr. Muraszewski's hospitalization.

29.     On March 1, 2021, at Dr. Raggali's direction, the Muraszewskis proceeded immediately to Defendant's facility, Columbia St. Mary's Hospital Milwaukee, accompanied by the two ASL interpreters who were with them at Dr. Raggali's office.

30.     Mr. Muraszewski checked in, and Hospital staff escorted him to a room.

31.     During this time period, Defendant had precautions in place related to the COVID-19 pandemic. As part of those precautions, Defendant only permitted one guest to accompany patients into the facility.

32. Dr. Raggali's office arranged 24/7 interpreters for the Muraszewskis through Professional Interpreting Enterprise ("PIE"). Jenny Buechner was assigned the day shift, and Catherine Eller was assigned the night shift.

33. On March 3, 2021, Mr. Muraszewski was taken into surgery. After saying their goodbyes, Mrs. Muraszewski and the interpreter, Ms. Buechner, proceeded to the waiting room. Ms. Buechner accompanied Mrs. Muraszewski to ensure her effective communication with Defendant's staff.

34. While in the waiting room, a nurse approached Mrs. Muraszewski and Ms. Buechner. Ms. Buechner relayed to Mrs. Muraszewski that the nurse said Ms. Buechner had to leave.

35. Ms. Buechner left per the nurse's directive.

36. As a result, Mrs. Muraszewski panicked and became frantic because she no longer had any communication access to understand her husband's dire medical condition. She called her children, Tammy and Jay Muraszewski, on FaceTime, sobbing out of fear and distress.

37. Ascension did not provide an interpreter after forcing the Muraszewskis' interpreter to leave.

38. Tammy called over forty phone numbers, including numerous numbers at St. Mary's, before finding someone at Dr. Raggali's office to help resolve the situation.

39. Tammy finally spoke with someone in Ascension's language services department. They informed her that Ascension would not pay for interpreters from PIE because Ascension has its own interpreters.

40. However, Ascension never sent one of its own interpreters to facilitate the Muraszewskis' effective communication.

41.     Additionally, Mr. Muraszewski had years of negative previous experiences with Defendant's interpretation services. As an outpatient, Mr. Muraszewski has been regularly denied interpreters by Ascension and its related entities. Ascension and related entities have also forced Mr. Muraszewski's daughter to serve as his interpreter for appointments. As a result, Mr. Muraszewski is more comfortable relying on interpreters from PIE rather than Ascension's language services.

42.     Several hours later, after advocacy from Tammy and Dr. Raggali's office, Ms. Buechner was permitted back into St. Mary's.

43.     Mr. Muraszewski's surgery ended, and he was transferred to the ICU while still intubated and sedated. After visiting with him, Mrs. Muraszewski left for the night.

44.     The following day, March 4, 2021, Mrs. Muraszewski arrived at the ICU floor in the morning. There was no one at the front desk to let her in. She noticed a buzzer next to the door and pressed it. There was a speaker next to the buzzer, but Mrs. Muraszewski was unable to hear if any instructions came through the speaker. After a long while, the door finally opened, and she entered the ICU.

45.     Ms. Buechner was present in the ICU to help Mrs. Muraszewski communicate with staff about her husband's condition and to help Mr. Muraszewski communicate when he awoke.

46.     Soon after Mrs. Muraszewski's arrival, a nurse entered Mr. Muraszewski's room and once again told Ms. Buechner that she must leave.

47.     This news deeply distressed Mrs. Muraszewski, who no longer had effective communication access to understand her husband's precarious medical situation. This made her feel lost and afraid. She once again called her children.

48.     Similar to the day before, Tammy made around sixty phone calls in an effort to resolve the situation.

49.     Tammy finally spoke with someone in Ascension's language services department. They informed her again that Ascension would not pay for interpreters from PIE because Ascension has its own interpreters.

50.     Ascension's language services department stated during the call with Tammy that they would send an interpreter to Mr. Muraszewski's room.

51.     St. Mary's never sent an interpreter to Mr. Muraszewski's room following this conversation or at all during his stay.

52.     Shortly after St. Mary's staff directed Ms. Buechner to leave, Dr. Raggali entered the room to update Mrs. Muraszewski on her husband's condition.

53.     Dr. Raggali, familiar with the family and the necessity of an interpreter for their understanding, immediately went to the nurse's station to investigate.

54.     He returned with a nurse holding an iPad intended to facilitate Virtual Remote Interpretation ("VRI"), a service in which interpreters provide communication services via video calls.

55.     VRI interpreters are selected based on availability, not familiarity with the situation. The interpreter who appeared via VRI had no context for the conversation at hand, unlike the in-person interpreters who had accompanied the family throughout their hospital stay.

56.     The VRI interpreter was unable to effectively communicate the serious, life-changing events transpiring due to his unfamiliarity with the situation.

57.     Further, the iPad froze for long periods of time during Mrs. Muraszewski's conversation with Dr. Raggali, frustrating both parties and preventing Mrs. Muraszewski from effectively communicating and understanding.

58.     After many instances of the iPad freezing, Dr. Raggali left and indicated he would return later when they could better facilitate communication.

59.     Mrs. Muraszewski was unable to receive important information about her husband's surgery, post-operative care, and medications because of the lack of effective communication.

60.     Mrs. Muraszewski was unable to understand her husband's care and/or condition due to a lack of communication access.

61.     Following the interpreter's dismissal, multiple nurses and doctors entered Mr. Muraszewski's room, performing procedures on Mr. Muraszewski and trying to speak with Mrs. Muraszewski. They were unable to do so without interpreters or functioning VRI.

62.     Later that day, Dr. Raggali returned and realized the Muraszewskis still did not have an interpreter. He indicated that Mrs. Muraszewski should wait, left the room, and returned once again with Ms. Buechner.

63.     Dr. Raggali called Ascension administration and decision-makers in order to secure the Muraszewskis' right to interpreters. After this, the interpreters were allowed to stay.

64.     However, once the interpreters were consistently accompanying the Muraszewskis, the nurses stopped visiting Mr. Muraszewski as often. On at least one occasion, Mrs. Muraszewski witnessed a nurse enter the room and then quickly leave after seeing the interpreter.

65.     Throughout Mr. Muraszewski's hospitalization, the nurses appeared uncomfortable around the Muraszewskis because of their deafness. Unlike with other patients, the nurses did not make small talk or act friendly towards the Muraszewskis.

66.     Mr. Muraszewski was discharged to home on March 8, 2021.

**Events at Ascension St. Francis Hospital**

67.     Mr. Muraszewski's doctor ordered in-person cardiac rehab at St. Francis to facilitate his recovery, but Mr. Muraszewski's treatment was delayed due to Ascension's failure to secure interpreters for his appointments.

68.     Mr. Muraszewski arrived for his first in-person appointment on April 30, 2021 at 9:00 AM. He was unable to receive treatment that day because Ascension did not schedule interpreters for his appointment despite assurances from the in-home therapists that Ascension had done so.

69.     During his treatment at St. Francis, the facility canceled his appointments on at least four more occasions due to its failure to secure interpreters: September 2, September 7, September 9, and October 26, 2021.

70.     St. Francis also utilized VRI rather than in-person interpreters for at least three appointments: August 17, 24, and 31, 2021.

71.     On or around December 14, 2021, Mr. Muraszewski arrived at St. Francis for his appointment.

72.     No interpreter was present, so he asked the therapist, Anna Gorn, where the interpreter was. She said the interpreter was coming and that it was scheduled in the computer.

73.     When the interpreter still had not shown up after a while longer, Mr. Muraszewski asked again about the interpreter. The therapist called Ascension's language services department.

74.     During this call, the language services department told the therapist that Mr. Muraszewski would no longer receive rehab services at St. Francis, effective immediately.

75.     The therapist tearfully relayed this information to Mr. Muraszewski before giving him a hug and telling him he had to leave.

76.     Mr. Muraszewski was confused. Per his doctor's orders, he still had additional rehabilitation to complete, including the appointments that had to be rescheduled because St. Francis did not provide interpreters.

77.     Mr. Muraszewski met with his cardiologist, Dr. Stair, who stated that Mr. Muraszewski needed to complete more rehabilitation when Mr. Muraszewski informed him of the cancellations. Dr. Stair did not order the end of Mr. Muraszewski's treatment.

78.     Dr. Stair said he would resolve the issue.

79.     No one at Ascension called Mr. Muraszewski to schedule further appointments to complete his cardiac rehabilitation.

80.     As a result of its actions, Ascension must develop a system to provide language services to address the communication needs of residents and residents whose preferred language is not English, including individuals who communicate through sign language.

81.     As a result of its actions, Ascension must identify a patient's preferred language for discussing health care.

82.     Deaf patients have the right to communicate through American Sign Language interpreters, including Certified Deaf Interpreters.

83.     The Muraszewskis require an ASL interpreter and a CDI simultaneously to receive equal participation and equally effective communication, especially for complex interactions.

84.     The Muraszewskis were deprived of the full and equal enjoyment of Ascension's benefits and services. Specifically, they did not receive a "like experience" as compared to non-disabled residents who receive full benefits and services from Ascension by communicating in their primary and preferred language.

85.     Mr. Muraszewski, as a person seeking medical treatment, had an expectation interest in the ability to fully participate in his own care, healthcare decisions, and all the benefits and services provided by Ascension, including but not limited to important discussions with doctors, nurses, and other critical members of the staff. Mr. Muraszewski also had an expectation interest in communicating with and being informed about his care by Ascension in his primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require.

86.     In failing to provide such equal treatment, Ascension intentionally discriminated against the Muraszewskis and acted with deliberate indifference to their federally protected rights because Ascension's staff knew that it was not effectively communicating with the Muraszewskis with the methods they were using. Likewise, Ascension's staff knew that the Muraszewskis would not be receiving equal participation on this same basis.

87.     The actions of Ascension's staff compromised the Muraszewskis' ability to receive equal participation when they did not communicate in their preferred and primary language, affecting their ability to receive communications as effective as those received by non-disabled consumers.

88.     Ascension's discrimination against the Muraszewskis not only caused emotional distress but also violated their civil rights.

89.     The Muraszewskis seek all remedies available under contract law, including

expectation-interest damages and specific performance. Ascension must honor Mr. Muraszewski's right to understand his rehabilitation and medical history by providing ASL interpreters to explain his prior history and procedures. A recitation of his care, with the ability to ask questions, would put Mr. Muraszewski in as good a position as if the contract had been performed.

90.    Mr. Muraszewski has no adequate remedy to understand his rehabilitation and treatment from Ascension. Here, when residents like Mr. Muraszewski arrive at a hospital or rehabilitation center for treatment, they expect that they can communicate with their healthcare providers about their care.

91.    Mr. Muraszewski should receive expectation-interest damages to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.

92.    Mr. Muraszewski had a reasonable expectation in the ability to fully participate in his own medical care, and Ascension denied Mr. Muraszewski this expectation interest by denying him the invaluable opportunity to be informed about his care and participate in healthcare decisions.

93.    Ascension was unjustly enriched through its failure to pay for interpreters and otherwise saved those costs throughout Mr. Muraszewski's hospitalization and rehabilitation.

94.    Based on Mr. Muraszewski's experience, Ascension has not implemented proper policies, procedures, trainings, and practices respecting the civil rights and communication needs of deaf individuals.

95.    Ascension knew or should have known of its obligations under state and federal anti-discrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including the provision of ASL interpreters to ensure equal

communication, participation, and treatment of deaf individuals.

96. Ascension knew or should have known that its actions and inactions created an unreasonable risk of causing the Muraszewskis greater levels of emotional distress than a hearing person would be expected to experience.

97. Ascension's actions and inactions compromised the Muraszewskis' ability to receive equal participation when they did not communicate in their preferred and primary language, affecting their ability to receive communications as effective as that received by non-disabled consumers.

98. Because Ascension failed to accommodate the Muraszewskis, they received services that were objectively substandard and that were inferior to those provided to residents who are hearing.

99. In doing so, Ascension intentionally discriminated against the Muraszewskis and acted with deliberate indifference to their civil rights.

100. Ascension intentionally and deliberately discriminated against the Muraszewskis by denying them the opportunity for the full and equal enjoyment of its programs, services, and activities.

101. Ascension intentionally and deliberately discriminated against the Muraszewskis by denying them the opportunity to participate in or benefit from its programs, services, and activities.

102. Ascension intentionally and deliberately discriminated against the Muraszewskis by offering or affording them services that do not equal those services afforded to other non-disabled individuals.

103. Ascension intentionally and deliberately discriminated against the Muraszewskis

by failing to make reasonable changes in policies, practices, or procedures.

104. Ascension intentionally and deliberately discriminated against the Muraszewskis by failing to establish a procedure for effective communication with them to provide its services.

105. The Muraszewskis still intend to visit Ascension's facilities in the future, including St. Mary's and St. Francis, given their proximity to their residence and the fact that they have previously visited their facilities, which maintain Mr. Muraszewski's medical records and history. However, they are deterred from doing so by Ascension's discrimination against them on the basis of disability.

## CAUSES OF ACTION

### CLAIM I: Violations of the Patient Protection and Affordable Care Act

106. Plaintiffs incorporate by reference all preceding paragraphs and reallege them in support of this claim.

107. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act has been in full force and effect and has applied to Defendants' conduct.

108. At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

109. At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care. Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

110. Under Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of

1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

111.    At all times relevant to this action, Plaintiffs' primary language for communication has been American Sign Language and she has a limited ability to read, write, speak, or understand English. Plaintiff has thus been an individual with limited English proficiency within the meaning of Section 1557 of the Patient Protection and Affordable Care Act.

112.    Under the Affordable Care Act, federal regulations adopt "the standards found at 28 CFR 35.160 through 35.164," which come from Title II of the Americans with Disabilities Act. 45 C.F.R. § 92.102(a).

113.    Under the Affordable Care Act, federal regulations provide that a "[covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b), *adopted by* 45 C.F.R. § 92.102(a). This regulation authoritatively construes the Affordable Care Act and was violated by Defendants.

114.    Under the Affordable Care Act, federal regulations provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the

provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–(iv). This regulation authoritatively construes the Affordable Care Act and was violated by Defendants.

115.     Federal regulations implementing the ACA further require that a covered entity that provides individuals with disabilities "qualified interpreters via VRI services shall ensure that it provides–(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of her or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 35.160 (*cited by* 28 C.F.R. §§ 35.104 & 36.303(f); in turn *cited by* 45 C.F.R. § 92.102(b)(1)(i)).

116.     A VRI system that does not meet all of these standards is not an "effective method[]" of making aurally delivered materials available to individuals with hearing impairments"— meaning a non-compliant VRI system does not count as an auxiliary aid or service. 42 U.S.C. §

12103(1)(A); 28 C.F.R. § 36.104; 28 C.F.R. Pt. 36 App. A ("[T]she Department has established performance standards for VRI in § 36.303(f). The Department recognizes that reliance on VRI may not be effective in certain situations, such as those involving the exchange of complex information or involving multiple parties . . . and using VRI in those circumstances would not satisfy a public accommodation's obligation to provide effective communication.").

117.     As set forth above, Defendants discriminated against Plaintiff on the basis of her disability in violation of the ACA and its implementing regulations.

118.     The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiff—that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act.  42 U.S.C. § 18116(a).

119.     The Rehabilitation Act—and by extension, the ACA—explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]she remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

120.     Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

121.     As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

122.     42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

123.     As set forth above, Defendants discriminated against Plaintiffs on the basis of their disability in violation of the ACA and its implementing regulations.

124.     Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

125.     As set forth above, Defendants discriminated against Plaintiffs on the basis of their disability in violation of the ACA and its implementing regulations and, by doing so, aggrieved Plaintiffs under the statute and its implementing regulations.

126.     Plaintiffs are also entitled to other forms of compensatory damages beyond emotional distress damages. The defendant is subject to remedies traditionally available in suits for breach of contract. Here, when patients like Plaintiff arrive at a hospital for treatment, they expect that they will be able to communicate with their healthcare providers about their care. Plaintiffs also had an expectation interest in being able to communicate with and be informed about Mr. Muraszewski's care by Defendant's staff in her primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require. The plaintiff's expectations also stem from the patient's bill of rights and the Defendant's policy, which was generated in response to the Affordable Care Act.

127.     Defendant denied Plaintiffs these expectation interests by failing to accommodate their disability and failing to provide equal treatment that it gives to non-disabled patients. Accordingly, the Plaintiff should be entitled to compensatory damages under her expected interest.

128.     Plaintiffs are therefore entitled to declaratory and injunctive relief, nominal damages, compensatory damages, and attorneys' fees, costs, and disbursements for the injuries and loss she sustained as a result of the Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.     Issue an injunction forbidding Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf individuals meaningful access to, and full and equal enjoyment of, Defendant's facilities, services, or programs in violation of Section 1557 of the Patient Protection and Affordable Care Act:

B.     Issue an injunction ordering Defendant to:

i.     offer an interpreter for the patient at no cost to the patient whenever an agent or employee encounters a patient whose primary language is something other than English;

ii.    train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under federal law;

iii.   honor Plaintiff Brad Muraszewski's right to understand his medical care history by providing American Sign Language interpreters to explain his prior history and procedures because a recitation of her care, with the ability to ask questions, would put him in as good a position as if the contract had been performed;

iv. develop, implement, promulgate, and comply with a policy requiring a clear offer of language assistance services. If a patient declines language assistance services after a bonafide offer of qualified sign language interpreter services at Defendant's own cost, document such refusal in a specific and uniform location in the patient's medical records, such that it can be readily retrieved in a review of those records. Such documentation shall include, at a minimum: (1) an acknowledgment, signed by the patient, that the availability of free language assistance services was explained to the patient in the patient's primary language and that she or she knowingly declined those services; (2) the name of the interpreter used to explain, in the patient's primary language, the patient's right to free language assistance services; and (3) the patient's reason or refusing language assistance services.

C. Order Defendant to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiffs to the position they would have been in but for the discriminatory conduct.

D. Award to Plaintiffs:

i. Nominal damages;

ii. Compensatory damages;

iii. Reasonable costs and attorney's fees;

iv. Interest on all amounts at the highest rates and earliest dates allowed by law; and

v. Any and all other relief that this Court deems just and appropriate.

Dated: June 17, 2024                              Respectfully submitted,

_____

Andrew Rozynski
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com
*Attorneys for Plaintiff*